BENJAMIN CRAWFORD and Others, Appellants, Respondents, *v.* EDWARD NILAN, Respondent, Appellant.

Third Department, April 29, 1942.

*George A. Grabow* [*Seymour L. Colin* of counsel], for the appellants, respondents, Crawford.

*Ellsworth Baker*, for the appellant, respondent, Hattie Palmer.

*Watts, Oakes, Vander Voort & Bright* [*Lawrence H. Cooke* of counsel], for the respondent, appellant.

FOSTER, J. The plaintiffs in this case have appealed from an order which set aside the verdicts of a jury in their favor; and the defendant has appealed from a separate part of said order which denied a motion for a directed verdict in his favor. The complaint embraces five causes of action based upon alleged negligence on the part of the driver of defendant's automobile.

The accident out of which these causes arose happened on a Sunday, June 16, 1940, about six-thirty in the afternoon, on a State highway, known as Route 52, at a point about three miles east of the village of Ellenville, N. Y. This highway runs in an easterly and westerly direction along the side of and over the Shawangunk Mountain. Near the top of the mountain there is a side road

which branches to the left and leads to a place known as Cragsmoor, where there is a religious hall maintained by the Catholic church, known as Vista Maria.

On the day in question the Crawford car, in which all of the plaintiffs were riding, was descending the main highway towards Ellenville. The defendant's car, driven by one Woodrow Smith, was ascending this mountain highway in an opposite direction. It is the contention of the plaintiffs that defendant's car was operated at a dangerous rate of speed under the circumstances, and on the wrong side of the road. As a result of a collision between the two cars, Julia Crawford, a passenger in the Crawford car, was killed; the other passengers severely injured; and Smith, the driver of defendant's car, was also killed. The defendant offered no direct testimony as to how the collision between the two cars occurred and rested his defense solely on the theory that at the time of this accident his car was being operated without his permission, either express or implied.

Defendant is a Catholic priest in charge of a parish at Ellenville. He had his own personal car, the one involved in the accident, and the parish also owned a car which was used for church purposes. According to his own testimony his personal car was used at various times for errands and missions connected with the affairs of the church.

Smith was a member of the church and employed by the parish as a part time janitor and handy man under the direction of defendant. Apparently it was a part of his duty to see that both the defendant's car and the parish car were serviced and cleaned. In addition he drove both cars at times, carrying priests to various missions in the surrounding territory, and on other errands. The defendant testified, however, that Smith did not have general permission to drive either car and that each trip was specifically authorized. Plaintiffs on their side of the case offered no testimony as to the authority of Smith on the day of the accident and relied solely upon the presumption which arises from ownership.

Defendant testified that on Saturday, the day before the accident, he told Smith that he would not need the Buick, his personal car, on Sunday, because he was going to a rally and that would be a good time to clean it. He also told him to see that it had sufficient gas and oil, and after that to bring the car back and clean it. In addition he gave Smith the following order: " I told him that we were going to the rally, and in the morning to go up and get Father Donovan and bring him down to the rectory and ask him to remain there while we were away." He was uncertain as to whether he told Smith which car to take. Father Donovan was staying at

Vista Maria, Cragsmoor, and this direction required Smith to drive up the mountain road, at least in the morning.

On Sunday morning Smith carried out this order and brought Father Donovan down from Cragsmoor to the rectory at Ellenville, arriving there at about noon according to the testimony of defendant's housekeeper. It does not appear what car Smith used for this purpose, but it does appear that he had used the defendant's car, with the latter's consent, for this same trip on other occasions. The defendant left by bus about one o'clock, with his assistant, to attend a rally at Poughkeepsie. Here it may be noted that Father Donovan evidently arrived at the rectory before the defendant left for Poughkeepsie and it is entirely reasonable to assume that defendant must have known what car was used to transport Father Donovan, and yet that fact is not established. This would indicate that Smith's duties as a chauffeur were loosely supervised and of a somewhat free and easy character.

Mrs. King, defendant's housekeeper, testified that she saw Smith about a quarter to twelve on Sunday morning and had this conversation with him: "And I told him to hurry up to Cragsmoor and get back for we were having an early dinner that day for the other visiting priest, and when he came back with Father Donovan for him to take Father Nilan's car and have it gassed and greased and the tires checked, and whatever was to be done in the garage, then he was to bring it back and wash it. So he said to me, ' Mrs. King, who is going to take Father Donovan back to Cragsmoor? ' And I said, ' Father Nilan asked me if I would take my Ford and take him back.' He said, ' Mrs. King, if I get back here at five-thirty and wash the car and have the car greased and so on, would it be all right?' I said, ' Woodrow, that is perfectly all right.' " It will be noted that she did not tell Smith when she intended to take Father Donovan back.

According to her testimony she left the rectory with Father Donovan for Cragsmoor in her own car, about a quarter to six in the afternoon, and arrived back between a quarter after and half past six. She did not observe the Buick car on her way back to the rectory. Her recollection is that when she left for Cragsmoor the Buick car was on the rectory property and when she returned it was gone. If her testimony is correct Smith took this car after she had left for Cragsmoor. Up to this point in so far as the record is concerned there is no direct testimony as to his purpose. There then occurred on the trial the incidents which later impelled the trial justice to set the verdicts aside. It was conceded that Smith was the operator of the defendant's car, but counsel for the plaintiffs refused to concede that there were three young men in

the car with him. Defendant called Walter C. Ignatik to prove this fact. He testified that he, Joseph Gash and George Byford were in the car at the time the accident occurred, and also as to where they entered the car. Upon cross-examination this occurred: " Q. Where were you going? A. We were going to get the priest up at Cragsmoor. Mr. Oakes: I object to where he was going as incompetent and irrelevant. Mr. Baker: It is cross-examination. * * * The Court: Overruled. Where were you going is the question. Mr. Oakes: Exception. (The answer was read by the stenographer.) Mr. Baker: That is all. Mr. Oakes: I move to strike it out on the ground that the witness' statement is a conclusion and hearsay. The Court: Denied. Mr. Oakes: I except."

Later on redirect-examination the witness admitted that he did not know anything about where he was going except as someone else told him. He also admitted that he had previously made a written statement and counsel for the defendant read into evidence this excerpt therefrom: " When he picked us up he said he was going to Cragsmoor, but I didn't hear him give any reason for going." On recross-examination he testified that he signed another written statement made on the same day that he was on the witness stand, and counsel for plaintiffs read into evidence this portion thereof: "At that time Woody Smith, a friend of ours, and whom I knew was in the employ of St. Mary's Catholic Church of Ellenville, was driving a Buick automobile belonging to Father Nilan, asked us whether we would care to accompany him in the Buick automobile to Cragsmoor where he was to pick up a priest and bring him back to Ellenville for the evening services."

The trial justice felt that this evidence was purely hearsay, erroneously admitted, and so highly prejudicial that he was required to set the verdicts aside. I do not regard its admission as entailing such a fatal effect. Indeed, in view of the fact that Smith was dead, I am not at all sure that statements made by him to Ignatik as to the purpose of the trip when the latter entered the car were not admissible directly as part of the *res gestæ*. There is respectable authority in other jurisdictions to support this view. (*Jennings* v. *Okin*, 88 N. J. L. 659; 97 A. 249; *Smith* v. *Firestone Tire & Rubber Co.*, 119 Conn. 483; 177 A. 524.) But in any event the manner in which this testimony was adduced left it properly in the record even though it was hearsay. By calling Ignatik the defendant placed him in a position where he was subject to cross-examination. The question as to where he was going was proper cross-examination, and did not make him a witness of the plaintiffs, because it was connected with his presence in the car, where he had been placed by questions put to him on direct examination for the obvious purpose of leading

to an inference that Smith, because he had companions with him, was engaged in a personal pleasure trip. The rules of evidence are not so inflexible that plaintiffs, faced by this situation, were limited in cross-examination to the precise details brought out on direct examination. They had the right, as a matter of cross-examination, to impair or destroy the implication raised by inquiring of Ignatik what he considered his destination to be, irrespective of from what source he adopted his conclusion. His answer, it is true, was not wholly responsive, but counsel for the defendant moved to strike it out in its entirety, something the trial court was not bound to do. That which followed with relation to the conflicting statements, previously made by the witness, was the choice of counsel. Under the present practice counsel for the defendant had the right to contradict or impeach his own witness if he so desired (Civ. Prac. Act, § 343-a), and of course counsel for plaintiffs had the right to adopt the same tactics since the witness was not called by him. In view of these considerations it does not seem to me that the incidents arising in connection with the testimony of this witness were fatal to the verdicts.

There remains the problem of what should be done with the case otherwise. On the issue of permission plaintiffs relied upon a presumption arising from ownership. Such a presumption remains and controls so long as there is no substantial evidence to the contrary. (*Chaika* v. *Vandenberg*, 252 N. Y. 101.) But who is to say when there is substantial evidence to the contrary, the court or a jury? There are, it is true, cases where the courts have decided this issue as a matter of law (*Der Ohannessian* v. *Elliott*, 233 N. Y. 326; *St. Andrassy* v. *Mooney*, 262 id. 368), but these cases represent rare exceptions, I think, and not the rule. Ordinarily the question must be one of fact for the jury to determine because it usually involves the credibility of witnesses and inferences to be drawn from surrounding circumstances. Thus, in the most simple case where the presumption is met with a bare denial of permission by the owner, or interested witnesses, the question is clearly for the jury. (*Piwowarski* v. *Cornwell*, 273 N. Y. 226; *Jorgensen* v. *Jaeger*, 257 id. 171; *Hartstein* v. *United States Trucking Corp.*, 260 App. Div. 643; *Christie* v. *Vineburg, Inc.*, 259 id. 342.)

In this case the jury was not bound to accept the testimony of the defendant in all particulars for at least two reasons: He was an interested witness; and he frankly conceded that his recollection was faulty when he was confronted by discrepancies between his testimony given on the examination before trial and that which he gave on the trial itself. The testimony of his former housekeeper, Mrs. King, added nothing at all of probative value on the issue of

permission, except the circumstance that she took Father Donovan back to Cragsmoor and that she told Smith she was going to do so. It is not disputed that she took Father Donovan back, but it was for the jury to say whether she told Smith that she intended to do so. Analyzed closely the defense presents practically nothing but this testimony on her part, plus the fact that she actually did take Father Donovan back, and the testimony of the defendant himself.

The testimony of the defendant that Smith only used the Buick car when he had specific directions to do so is open to some doubt; and the jury, I think, could have justly found that there was no hard and fast rule about its use. On the very day of the accident apparently neither the defendant nor any one connected with the rectory knew which car Smith used to bring Father Donovan down from Cragsmoor in the morning. From this fact alone the jury might well have drawn the inference that whatever arrangement existed it was loose enough to imply some discretion in Smith.

To sustain his defense defendant relies heavily upon the fact that Father Donovan had been returned to Cragsmoor by Mrs. King, and argues that Smith, a servant, was not authorized to effect the priest's return to Ellenville; that, therefore, Smith could have had no legitimate purpose of the church in mind when the accident occurred. This argument is entitled to weight but is not conclusive in view of the instructions which had been given to Smith. He had been told to ask Father Donovan to remain at the rectory at Ellenville while the defendant was away. The interposition of Mrs. King had frustrated this direction. The defendant had not returned, Father Donovan had gone, and the parish was without a priest. Under these circumstances it would seem that the jury had a right to find that Smith undertook a second journey to Cragsmoor to ask the priest to return, and that his instructions justified such a course and the use of the Buick car. If Smith was engaged in a pleasure trip it is a peculiar coincidence that he chose the route to Cragsmoor. At least an issue is presented that, in the light of all the circumstances, should not be determined as a matter of law. In this connection we are bound by the rule that plaintiffs are entitled to the most favorable inferences to be drawn from the evidence. Doubtless the case is close and not entirely free from some doubt, nevertheless I think there is sufficient evidence to sustain the verdicts of the jury.

The order setting aside the verdicts in favor of the plaintiffs should be reversed and the verdicts reinstated; the order denying a motion for a directed verdict in favor of the defendant should be affirmed.

HILL, P. J., and BLISS, J., concur; HEFFERNAN, J., dissents, in a memorandum, in which SCHENCK, J., concurs.

HEFFERNAN, J. (dissenting). I dissent from the opinion of Justice FOSTER and vote to sustain the order of the trial judge granting new trials. I think that these verdicts are against the clear weight of the evidence and that a finding that defendant's car was being used with his permission is against the great weight of the testimony. However, I concede that there are questions of fact in the case and I agree with Judge FOSTER that the question to the witness Ignatik, " Where were you going? " was proper. I think, however, the trial judge clearly erred in receiving the statement prepared in the attorney's office on March 24, 1941, and which reads: "At that time Woody Smith, a friend of ours, and whom I knew was in the employ of St. Mary's Catholic Church of Ellenville, was driving a Buick automobile belonging to Father Nilan, asked us whether we would care to accompany him in the Buick automobile to Cragsmoor where he was to pick up a priest and bring him back to Ellenville for the evening services." This testimony enlarged that previously given by the witness and clearly was prejudicial. It was pure hearsay. The fact that defendant had shown that this witness made a prior inconsistent statement did not warrant this proof. The defendant had a perfect right to do that under section 343-a of the Civil Practice Act. The only purpose of this statement was to fortify the witness' own prior testimony. For that purpose it is clearly inadmissible. (20 Am. Jur., Evidence, § 458, and cases there cited.)

SCHENCK, J., concurs.

Order reversed on the law and facts and judgment reinstated, with costs.